## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

EUGENE NABORS,

      Plaintiff,

v.                                    CIVIL ACTION NO.  5:22-cv-00059

SR. TROOPER J.L. TINCHER,

      Defendant.

### MEMORANDUM OPINION AND ORDER

Pending is Defendant Sr. Trooper J.L. Tincher's Motion for Summary Judgment, filed August 14, 2023. [ECF 54]. Plaintiff Eugene Nabors responded on August 28, 2023. [ECF 56]. Trooper Tincher replied on September 5, 2023. [ECF 59]. The matter is ready for adjudication.

### I.

On February 11, 2020, Greenbrier East High School and Woodrow Wilson High School were scheduled to play in a regular season high school girls' basketball game at Greenbrier East. [ECF 14 ¶ 6]. Plaintiff Eugene Nabors is an assistant coach for the Woodrow Wilson High School girls' basketball team. [*Id.* ¶ 9]. Defendant Senior Trooper J.L. Tincher was one of three state troopers assigned to provide community policing for the game. [ECF 55 at 2]. Also in attendance at the basketball game was Governor Jim Justice, the head coach for the Greenbrier East High School girls' basketball team. [ECF 56 at 2].

Throughout the game Mr. Nabors heard the Greenbrier East fans "yelling racial slurs and epithets" at Woodrow Wilson's players and coaching staff. [ECF 14 ¶ 13]. During a timeout at the beginning of the fourth quarter, Mr. Nabors walked to the baseline to discuss the

misconduct with two Woodrow Wilson administrators, namely, Principal Rocky Powell and Athletic Director J.T. Payne. Steve Damon and one other Greenbrier East fan interrupted Mr. Nabors' conversation with the administrators and tried to instigate a confrontation. [*Id.* ¶ 16]. Mr. Nabors' adult son Donte Nabors exited the stands and approached the group. [*Id.* ¶ 18]. Trooper Tincher and Sgt. D.P. White simultaneously did likewise. [*Id.*]. Mr. Nabors attempted to usher Donte Nabors back to the sideline; Trooper Tincher followed them.[1] [*Id.* ¶ 19].

Upon reaching the sideline, Donte Nabors threw a chair from the Woodrow Wilson bench. [ECF 55 at 3]. The chair was not thrown onto the playing surface or toward the baseline where the initial encounter occurred. It was thrown in apparent frustration in the opposite direction of the encounter moments earlier at the baseline. Seconds later, Trooper Tincher is seen speaking with Mr. Nabors at the sideline. Donte Nabors is not attempting to flee and can be seen looking on while his father and Trooper Tincher are engaged in a discussion, with Trooper Tincher moving Mr. Nabors backward toward his onlooking son. Mr. Nabors is positioned at this point between his son and Trooper Tincher for these few seconds, in what appears to be an attempt to deescalate the situation and, perhaps, prevent Trooper Tincher from reaching Donte Nabors.

The video next shows Trooper Tincher suddenly and forcefully -- and, according to Mr. Nabors, without justification -- push Mr. Nabors backward vigorously, knocking him from his feet and causing him to fall backward, resulting in him sustaining a broken arm and back injury.

---

[1] Mr. Nabors and Trooper Tincher's accounts conflict at points. [ECF 55-56]. "To the extent the video depicts material facts of this case, [the Court] review[s] those facts as they are depicted in the video." *Hupp v. Cook*, 931 F.3d 307, 314 n.3 (4th Cir. 2019) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)). "Where, however, the video 'does not "clearly" or "blatantly" contradict' [Mr. Nabors'] version of the facts, we adopt [his] version in reviewing the grant of summary judgment to Trooper [Tincher]." *Id.* (citing *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276–77 (4th Cir. 2011) (quoting *Scott*, 550 U.S. at 378)).

[ECF 14 ¶ 21]. Mr. Nabors does not remember what Trooper Tincher said prior to the push but did not recall it including a command to move out of Trooper Tincher's way. [ECF 54-2 at 135-36].[2] At the time of the incident, Trooper Tincher was 5'11" or 6' tall and weighed 190 pounds; Mr. Nabors frame was considerably more substantial, at 6'2" tall and weighing 210 pounds. [ECF 54-1 at 185, 54-2 at 130].

Following the push and sustaining the broken arm and back injury, Mr. Nabors was arrested and handcuffed, escorted out of the gymnasium, and transported to the Lewisburg detachment of the West Virginia State Police. [ECF 14 ¶ 22 and 24]. Mr. Nabors was the only individual arrested that night. [ECF 54-4, 54-3 at 61-62]. Sgt. White asserted they intended to "charge [Mr. Nabors] that night, have him arraigned by the magistrate, and furthermore, to complete the requirements of response to resistance or aggression policy and have him medically screened." [ECF 54-3 at 63].

Captain Drew Pendelton, who headed Governor Justice's security detail, intervened. Upon arrival at the Lewisburg detachment that evening, Captain Pendelton spoke to Sgt. White regarding Mr. Nabors. [*Id.* at 25]. Captain Pendelton instructed Sgt. White to issue Mr. Nabors a citation for obstructing, after which Sgt. White and Trooper Tincher returned Mr. Nabors to Greenbrier East High School. [*Id.*]. This appears to have been in response to the refusal by the

---

2 Again, this is disputed by Trooper Tincher, who testified he instructed Mr. Nabors to move out of his way. [ECF 55 at 3]. After Mr. Nabors failed to comply with the verbal command, Trooper Tincher states it was only then he pushed Mr. Nabors, deeming it essential to regaining his freedom of movement from Mr. Nabors in order to detain Donte Nabors. [*Id.*]. Binding precedent requires the Court to disregard these assertions. *See*, *e.g.*, *Aleman v. City of Charlotte*, 80 F.4th 264, 293 (4th Cir. 2023) ("[A]t this stage of the proceedings, [the law enforcement officer's] account cannot be credited, nor can inaccuracies in his account be excused as innocent misperceptions . . . ."); *Franklin v. City of Charlotte*, 64 F.4th 519, 529–30 (4th Cir. 2023) ("[W]e may not credit defendant's evidence, weigh the evidence, or resolve factual disputes in the defendant['s] favor.") (quoting *Hensley ex rel. v. Price*, 876 F.3d 573, 579 (4th Cir. 2017)).

Woodrow Wilson girls' basketball team to leave until Mr. Nabors returned. [*Id.* at 25 and 100]. On February 12, 2020, Trooper Tincher filed two additional criminal complaints against Mr. Damon and Donte Nabors. Mr. Damon was cited for disorderly conduct and Donte Nabors for both disorderly conduct and obstructing. [ECF 54-7 at 22-23, 27-28].

On February 2, 2022, Mr. Nabors instituted this action against Trooper Tincher and Sgt. White. [ECF 1]. On August 14, 2023, Trooper Tincher moved for summary judgment. [ECF 54]. On August 28, 2023, Mr. Nabors responded [ECF 56], followed by Trooper Tincher's September 5, 2023, reply. [ECF 59].

Trooper Tincher asserts (1) the doctrine of judicial estoppel bars Mr. Nabors' claims, (2) he is entitled to qualified immunity, (3) his use of force was reasonable under the Fourth Amendment, (4) he was privileged as a law enforcement officer to use the force involved, and (5) Mr. Nabors has failed to show Trooper Tincher committed an assault and battery.

## II.

### A.    *Governing Standard*

Rule 56 of the *Federal Rules of Civil Procedure* provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The nonmoving party must do so by offering 'sufficient proof in the form of admissible evidence' rather than relying solely on the allegations of her pleadings." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)).

The Court must "view the evidence in the light most favorable to the [nonmoving] party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (internal quotation marks and citation omitted); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). "The court . . . cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *see Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). In general, if "an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment.

## B.   *Judicial Estoppel*

Judicial estoppel was "developed to prevent a party from taking a position in a judicial proceeding that is inconsistent with a stance previously taken in court." *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007); *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir. 1995) ("The vice which judicial estoppel protects is the cold manipulation of the courts to the detriment of the public interest.").  Our Court of Appeals has more recently noted the Supreme Court's observations as follows:

> As the Supreme Court has explained, judicial estoppel is an equitable doctrine, designed to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." New *Hampshire v. Maine*, 532 U.S. 742, 749–50, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (internal quotation marks omitted). Typically, judicial estoppel is reserved for cases where the party to be estopped – here, [plaintiff] – has taken a later position that is "clearly inconsistent" with her earlier one; has persuaded a court to adopt the earlier position, creating a perception that "either the first or the second court was misled"; and would "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750–51, 121 S.Ct. 1808 (internal quotation marks omitted). Finally, and central to this case, there is the longstanding principle that judicial estoppel applies only when "the party who is alleged to be estopped intentionally misled the court to gain unfair advantage," and not when "a party's prior position was based on inadvertence or mistake." *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir. 1995) (emphasis

added) (internal quotation marks omitted); *accord New Hampshire*, 532 U.S. at 753, 121 S.Ct. 1808 (quoting *John S. Clark*, 65 F.3d at 29).

*Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019). Importantly, the doctrine is "applied with caution and only in the narrowest of circumstances." *Gilliam v. Sealey*, 932 F.3d 216, 233 (4th Cir. 2019) (cleaned up).

Trooper Tincher's judicial estoppel contention relies upon the stipulation of facts contained in the Resolution of Charges Mr. Nabors' signed in a related criminal proceeding. The pertinent language reads as follows:

> [I]n an effort to eliminate the potential for an escalation, Sr. Tpr. J.L. Tincher was seeking to remove and escort co-defendant Donte Nabors from the building, and in approaching said co-defendant, the Defendant Eugene Nabors, understandably perhaps, but *intentionally and perhaps unlawfully attempted to intervene in the Officer's pursuit of co-defendant Donte Nabors physically laying on of hands on said trooper who then reasonably pushed defendant Eugene Nabors away* in an effort to gain control of co-defendant Donte Nabors and prevent the reasonably perceived threat of violence involving the parties.

[ECF 54-5 at 4] (emphasis added). Trooper Tincher contends this excerpt "clearly and directly" contradicts the allegations of the Amended Complaint. [ECF 55 at 8].

Prior to reaching the judicial estoppel contention, a preliminary matter is noteworthy, despite the parties' failure to raise it. The language used in the Resolution of Charges -- such as "reasonably pushed defendant Eugene Nabors" -- bears a striking resemblance to a *sub rosa* release and dismissal agreement. While the Court need not reach this issue, such agreements are subject to considerable scrutiny. *See Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987) ("Most importantly, the Court of Appeals did not consider the wide variety of factual situations that can result in release-dismissal agreements. Thus, although we agree that in some cases these agreements may infringe important interests of the criminal defendant and of society as a whole, we do not believe that the mere possibility of harm to these interests calls for a *per se* rule."). Our

Court of Appeals has additionally observed as follows respecting *Rumery*:

> In supplying the Court's fifth vote, Justice O'Connor noted that "[m]any factors" might bear on whether a release-dismissal agreement is voluntary and not the product of prosecutorial overreaching:
>
>> The knowledge and experience of the criminal defendant and the circumstances of the execution of the release, including, importantly, whether the defendant was counseled, are clearly relevant. The nature of the criminal charges that are pending is also important, for the greater the charge, the greater the coercive effect. The existence of a legitimate criminal justice objective for obtaining the release will support its validity. And, importantly, the possibility of abuse is clearly mitigated if the release-dismissal agreement is executed under judicial supervision.

*Cox v. Duke Energy Inc.*, 876 F.3d 625, 630 (4th Cir. 2017) (quoting *Rumery*, 401–02). It would thus appear the defense of judicial estoppel would hinge first on whether the Resolution of Charges in fact constituted a *de facto* release and dismissal agreement. If so, the document would be subject to the *Rumery/Cox* rubric.

Assuming enforceability of the Resolution of Charges, however, and that the first two judicial estoppel elements are satisfied, Trooper Tincher emphasizes Mr. Nabors' deposition testimony. Mr. Nabors testified he reviewed and signed the stipulation containing the excerpt, resulting in dismissal of the criminal action. [ECF 54-2 at 34, 36]. But he also contends he did so "through an email . . . , [and he was] just told . . . [by his] lawyer, Randolph McGraw, to go ahead and sign it." [*Id.* at 32]. This later statement indicates he may have misunderstood the stipulation. [*Id.* at 32-37]. Additionally, Mr. Nabors testified that, prior to the date of his deposition, he had not seen the Complaint or Amended Complaint filed herein. [*Id.* at 9]. There may also be additional evidence that bears on the proper application of this preclusive doctrine, especially inasmuch as it is sparingly applied.

Based upon the foregoing discussion, Trooper Tincher is not at this time entitled to judgment as a matter of law on the defense. The Court **DENIES** Trooper Tincher's Motion for Summary Judgment on the grounds of judicial estoppel.

### C.     *Qualified Immunity*

Title 42 U.S.C. § 1983 governs actions against state officers arising out of their deprivations of constitutional rights:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983. A state actor sued in his individual capacity for monetary damages generally qualifies as a suable "person" under Section 1983. *Hafer v. Melo*, 502 U.S. 21, 27 (1991). But he may be entitled to qualified immunity. Qualified immunity is available only to those who do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Garrett v. Clarke*, 74 F.4th 579, 583 (4th Cir. 2023). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up); *see D.C. v. Wesby*, 583 U.S. 48, 63 (2018); *Garrett*, 74 F.4th at 584. "To determine if the right in question was clearly established, we first look to cases from the Supreme Court, th[e] Court of Appeals, or the highest court of the state in which the action arose." *Thompson v. Commonwealth of Va.*, 878 F.3d 89, 99 (4th Cir. 2017) (citing *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004)); *Franklin v. City of Charlotte*, 64 F.4th 519 (4th Cir. 2023). Absent "directly on-point, binding authority," courts may also consider whether "the right was clearly established based on

8

general constitutional principles or a consensus of persuasive authority." *Booker v. South Carolina Dep't of Corrections*, 855 F.3d 533, 543 (4th Cir. 2017); *Owens*, 372 F.3d at 279. In sum, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

Mr. Nabors' excessive force claim hinges upon his showing "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015); *Dilworth v. Adams*, 841 F.3d 246, 255 (4th Cir. 2016). Courts must assess objective reasonableness "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397. The use of force is viewed "in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Smith v. Ray*, 781 F.3d 95, 101-02 (4th Cir. 2015) (citing *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)); *T.W. ex rel. E.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018). "The intent or motivation of the officer is irrelevant; the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)); *Hupp*, 931 F.3d at 322 (citing *Jones v. Buchannan*, 325 F.3d 520, 528 (4th Cir. 2003)).

Nevertheless, "[i]n considering the reasonableness of an officer's actions, [the court] must consider the facts at the moment that the challenged force was employed." *Ray*, 781 F.3d at 101. Foremost, "the reasonableness of force employed can turn on a change of circumstances during an encounter lasting only a few seconds." *Harris v. Pittman*, 927 F.3d 266, 274 (4th Cir. 2019) (citing *Waterman*, 393 F.3d at 481); *Betton v. Belue*, 942 F.3d 184, 191 (4th Cir. 2019). Additionally, "Not every push or shove, even if it may later seem unnecessary in the

peace of a judge's chambers, violates a prisoner's constitutional rights." *United States v. Gore*, 592 F.3d 489, 495 (4th Cir. 2010); *Saucier v. Katz*, 533 U.S. 194, 209, 121 S. Ct. 2151, 2160, 150 L. Ed. 2d 272 (2001) ("We have approved the observation that '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" (citations omitted). Pushes and shoves, like other police conduct, must be judged under the Fourth Amendment standard of reasonableness."), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The qualified immunity analysis hinges upon a few seconds of events when no one – except Mr. Nabors and Trooper Tincher – know what was said by each and the force used by both. And those few seconds -- not to mention the surrounding environment -- are critical. *See*, *e.g.*, *Est. of Jones by Jones v. City of Martinsburg*, 961 F.3d 661, 668 (4th Cir. 2020); *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) ("'In considering whether an officer used reasonable force, a court must focus on the moment that the force is employed.'") (quoting *Elliott*, 99 F.3d at 643). That is especially so given the multifactor governing test:

> "[S]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Whether an officer has used excessive force depends on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

*Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021); *Smith*, 781 F.3d at 101. In a recent opinion, our Court of Appeals also included an additional factor, namely, "whether the officer applied an established technique . . . ." *Omeish v. Kincaid*, No. 22-1826, 2023 WL 7563935, at *7 (4th Cir. Nov. 15, 2023). The Court "also consider[s] the extent of the plaintiff's injuries." *Hupp*, 931 F.3d at 322 (citing *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994)). "Ultimately, [the court] must

decide 'whether the totality of the circumstances justifie[d] a particular sort of ... seizure.'" *Id.* (citing *Smith*, 781 F.3d at 101 (omission in original) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985))).

The video of the incident shows much respecting the hostile and deteriorating environment at the event, where the Chief Executive of West Virginia was in attendance. [ECF 56-3, ECF 58]. Although the Court set forth earlier a summary version of the events, a second-by-second analysis is helpful.  At the 19-second point in the video, Mr. Nabors is seen headed toward the baseline approaching individuals described earlier as Woodrow Wilson administrators. At the 23-second mark, the aforementioned Greenbrier East fans join the discussion at the baseline. One to two seconds later, Mr. Damon, who might objectively be described as quite aggressive, approaches Mr. Nabors and the administrators from behind.  Mr. Damon is then seen a second later directly behind Mr. Nabors while leaning in to say something to him. The two then appear face to face when, at the 28-second mark, Athletic Director J.T. Payne steps between them and moves Mr. Damon backward, with Mr. Damon appearing to continue to engage Mr. Nabors verbally. Mr. Nabors alleges that he does not remember what was said to him by Mr. Damon and the other Greenbrier East fan during this confrontation at the baseline. [ECF 54-2 at 116-19]. And Trooper Tincher asserts he could not hear the exchange between the parties. [ECF 54-1 at 49, 62, 164].

It is near this point when Donte Nabors enters the viewing angle of the video and begins rapidly cutting the distance from the sideline to the developing baseline confrontation. Three to four seconds later, Donte Nabors arrives at the group, with Mr. Nabors and Trooper Tincher just inches away. At the 34-second point, Mr. Nabors appears to step between Donte Nabors and Woodrow Wilson Principal Rocky Powell to begin ushering Donte Nabors away

toward the chairs on the Woodrow Wilson sidelines. Trooper Tincher is seen following Mr. Nabors, who can be seen thereafter attempting to de-escalate Donte Nabors in the few seconds following. At the 38-second point, Donte Nabors is seen walking away from his father past a line of team chairs on the Woodrow Wilson sidelines. It is at this point Mr. Nabors turns to find Trooper Tincher in pursuit, facing him, and either touching or nearly touching his left arm. Donte Nabors then throws one of the team chairs out of the camera's field of view.

      For the next few seconds, Mr. Nabors and Trooper Tincher are speaking and touching each other with their hands, with Mr. Nabors backing up and Trooper Tincher following, apparently in measured pursuit of Donte. At the 41-second point, Mr. Nabors and Trooper Tincher's faces are nearly touching as they converse. And the encounter appears to change in less than a heartbeat. With Donte Nabors just a few feet behind, and Mr. Nabors slowing or halting Trooper Tincher's forward movement, Trooper Tincher forcefully pushes Mr. Nabors, who stumbles rapidly backward and falls. At the 44-second point Trooper Tincher then lays hold of Donte, pushing him out of the viewing angle, while Sgt. White approaches Mr. Nabors. At the 2:10-second point, Donte Nabors returns to the gymnasium and appears behind the Woodrow Wilson bench. Donte Nabors is seen at 2:34-second point being removed by Trooper Tincher and another officer.

      The multifactor analysis begins with the "severity of the crime at issue." Mr. Nabors was ultimately arrested for obstructing, a misdemeanor. *See* W. Va. Code §61-5-17(a). When the offense is a "minor one," our Court of Appeals has concluded "the first *Graham* factor weigh[s] in [the] plaintiff's favor." *Hupp*, 931 F.3d at 322 (describing obstructing under W. Va. Code §61-5-17(a) as slight when determining the severity of the crime plaintiff was arrested for in a § 1983 action for excessive force) (citing *Jones*, 325 F.3d at 528) (citing *Graham* 490 U.S. at 395)).

Second, the evidence suggests that Mr. Nabors did not "pose an immediate threat to the safety of the officer or others." Trooper Tincher states in his deposition that he was not fearful for his physical safety from Mr. Nabors and pushed Mr. Nabors to regain his freedom of movement and perform his duties. [ECF 54-1 at 86-87]. Trooper Tincher does not recall Mr. Nabors saying anything aggressive or threatening to him. [*Id.* at 122]. Trooper Tincher testified that he believed Donte Nabors posed a threat, not Mr. Nabors. [*Id.* at 180-81]. Additionally, Trooper Tincher testified that when Donte Nabors came out of the stands and approached the group, Donte Nabors appeared to be the more imminent threat to the group and describes him as the "primary aggressor." [ECF 54-1 at 79]. It is important to note as well that no party seriously suggests there was ever any danger to Governor Justice or others as the events unfolded.

Third, there is disputed evidence as to whether Mr. Nabors was "actively resisting or attempting to evade arrest by flight." The video depicts the brief encounter between Mr. Nabors and Trooper Tincher. Mr. Nabors and Trooper Tincher provide differing accounts of this seconds-long encounter. Mr. Nabors generally asserts he was in a "defenseless position with his hands and arms stretched wide." [ECF 56 at 3]. The video does not support that assertion. Mr. Nabors additionally states, however, that while he was speaking with Trooper Tincher, he was quite suddenly and without justification pushed backward with sufficient force to knock him from his feet. [*Id.*]. The Court is presently unable to calculate the force necessary to move a 6'2" tall, 210-pound male so rapidly backward that he falls with enough force to cause broken bones. And that point in the encounter is critical to the outcome of the qualified immunity inquiry. Among other issues relevant to the inquiry is whether the push was truly "without justification."[3]

---

[3] Again, Trooper Tincher's account differs markedly from Mr. Nabors' version. Trooper Tincher contends that, while he was pursuing Donte Nabors, Mr. Nabors was unjustifiably restricting him. [ECF 55 at 3]. And as Trooper Tincher was speaking with Mr. Nabors, he

Fourth, there is evidence to suggest a push is an established technique utilized by the West Virginia State Police. F/Sgt. D.A. Evans investigated Trooper Tincher's actions on February 11, 2020. [ECF 55 at 5, ECF 56-5 at 22]. After reviewing video of the incident and obtaining statements from individuals involved, F/Sgt. Evans opined Trooper Tincher "acted within the guidelines of the West Virginia State Police Operational Policy and Procedure 10-1." [ECF 56-5 at 25]. Additionally, Sgt. White explains that a shove "falls under the empty hand options that we have" and is an appropriate response to resistance. [ECF 54-3 at 41]. The experts retained by the parties, however, provide contradictory analyses of Trooper Tincher's actions and his putative attempt to de-escalate the situation. [ECF 54-4 at 11, ECF 56-6 at 10].

When determining whether a right was clearly established "[courts] do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. *Ashcroft*, 563 U.S. at 741; *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). "[O]ur precedent makes clear that a nonviolent misdemeanant who is compliant, is not actively resisting arrest, and poses no threat to the safety of the officer or others should not be subjected to 'unnecessary, gratuitous, and disproportionate force.'" *Yates v. Terry*, 817 F.3d 877, 888 (4th Cir. 2016); *Ray*, 781 F.3d at 104 (precluding the defense of qualified immunity where an officer threw a woman to the ground with no verbal warning prior to physical contact); *see Jones v. Buchanan,* 325 F.3d 520, 534 (4th Cir. 2003)*; Bailey v. Kennedy,* 349 F.3d 731, 745 (4th Cir. 2003); *Rowland v. Perry,* 41 F.3d 167, 174 (4th Cir.1994); *Johnson v. City of Fayetteville*, 91 F. Supp. 3d 775, 804

---

witnessed Donte Nabors throw a chair. [*Id.*]. Trooper Tincher testified he first gave verbal commands for Mr. Nabors to move and then tried to move around Mr. Nabors to apprehend Donte Nabors. [*Id.*]. Trooper Tincher states it was only then he pushed Mr. Nabors, deeming it essential to regaining his freedom of movement from Mr. Nabors in order to detain Donte Nabors. [*Id.*]. Both parties retained experts regarding Trooper Tincher's actions. Their respective opinions differ considerably. [ECF 55 at 15, 56 at 12]. As noted, these factual disputes are not considered in the qualified immunity analysis.

(E.D.N.C. 2015); *see also Reid v. W. Virginia State Police*, 641 F. Supp. 3d 293, 300 (S.D.W. Va. 2022). When resolving factual disputes in Mr. Nabors' favor, he was arrested for obstructing, though he was compliant with Trooper Tincher, not actively resisting arrest, and posed no threat to the safety of Trooper Tincher or others. In sum, no reasonable officer would have believed it necessary under the circumstances to so forcefully push a nonviolent, nonthreatening, compliant, 6'2" tall, 210- pound male in a manner capable of producing broken bones.

Largely absent from the parties' submissions and the evidentiary record are (1) the unlawful conduct of Donte Nabors in the moment, as opposed to a determination thereof after the fact, (2) the group discussion that perhaps informed Trooper Tincher's threat analysis and pursuit of Donte Nabors, and (3) other factors that may have been indicative of either de-escalation or flight. Assessing, however, the facts and reasonable inferences in Mr. Nabors' favor, combined with those case law factors unfavorable to Trooper Tincher, along with the existence of a clearly established right prohibiting the force here used, qualified immunity is inappropriate. *See Hupp*, 931 F.3d at 323; *see also Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994). Inasmuch as there are genuine issues of material fact respecting the reasonableness of the force applied, the Court **DENIES** Trooper Tincher's Motion for Summary Judgment on qualified immunity grounds.

### D.     *Assault and Battery*

In Count Two, Mr. Nabors asserts a claim against Trooper Tincher for assault and battery. [ECF 14 at 7]. In West Virginia, a person is liable for assault if: "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." *Weigle v. Pifer*, 139 F. Supp. 3d 760, 776 (S.D.W. Va. 2015) (citing *West Virginia Fire & Casualty Co. v. Stanley*, 216 W.Va. 40, 51, 52, 602 S.E.2d 483 (2004) (quoting Restatement (Second) of

Torts § 13 (Am. L. Inst. 1965)). In West Virginia, a person is liable for battery if: "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Id.*

Trooper Tincher asserts that his actions were privileged, and that Mr. Nabors has failed to establish the requisite intent to survive summary judgment. "An activity, however, that would otherwise subject a person to liability in tort for battery or assault does not constitute tortious conduct if the actor is privileged to engage in such conduct." *Murray v. Lilly*, 426 F. Supp. 3d 245, 256 (S.D.W. Va. 2019) (citing *Hutchinson v. West Virginia State Police*, 731 F. Supp. 2d 521, 547 (S.D.W. Va. 2010) (citation omitted)). As noted, genuine issues of material fact are extant respecting whether the force used by Trooper Tincher was reasonable given the totality of the circumstances.

The Court **DENIES** Trooper Tincher's Motion for Summary Judgment on the assault and battery claims.

### IV.

For the foregoing reasons, the Court **DENIES** Trooper Tincher's Motion for Summary Judgment **[ECF 54].**

The Court directs the Clerk to transmit a copy of this Memorandum Opinion and Order to counsel of record and to any unrepresented party.

ENTER:      December 1, 2023



Frank W. Volk
United States District Judge